Ex parte HAMAGUCHI.

(Circuit Court, D. Oregon. April 6, 1908.)

No. 3,260.

1. ALIENS—RIGHT TO ENTER—IMMIGRATION ACT.

Immigration Act Feb. 20, 1907, c. 1134, § 20, 34 Stat. 904 (U. S. Comp. St. Supp. 1907, p. 401), provides that any alien who shall enter the United States in violation of law shall, on the warrant of the Secretary of Commerce and Labor, be taken into custody and deported to the country whence he came. Section 21 (34 Stat. 905 [U. S. Comp. St. Supp. 1907, p. 402]), declares that, in case the Secretary be satisfied that an alien has been found in the United States in violation of the act, he shall cause the alien to be taken into custody and returned as provided in the preceding section. The act also specifically provides for inspection at water ports of entry, and authorizes the Commissioner General of Immigration to prescribe rules for entry at border ports, pursuant to which Blaine, Wash., was designated by rule 24 as a border port of entry from Canada, and by rule 25 it was declared that if an alien arrives in Canada, whose destination is the United States, inspection shall be had at certain ports in Canada, and if applicant is entitled to admission, he shall receive a certificate from the United States Commissioner of Immigration for Canada, which, on presentation at the border port, shall entitle him to entry without further examination or identification, but that, if an alien destined to Canada applies at a border port for admission, he shall submit to inspection by a board of special inquiry at certain border ports, including Blaine. Held, that where a Japanese laborer, excluded by executive order March 14, 1907, came to Canada destined to the United States, or came destined to Canada and thereafter surreptitiously entered the United States, passing through Blaine at night, without presenting himself to the inspecting officers, he was unlawfully in the United States and subject to deportation.

2. SAME—IMMIGRATION RULES—VALIDITY.

Immigration Act Feb. 20, 1907, c. 1134, § 32, 34 Stat. 908 (U. S. Comp. St. Supp. 1907, p. 408), provides that the Commissioner General of Immigration shall prescribe rules for the entry and inspection of aliens along the borders of Canada and Mexico, and section 22 (34 Stat. 905 [U. S. Comp. St. Supp. 1907, p. 403]) gives general authority to establish rules and regulations to carry out the provisions of the act. Held, that rule 24, providing that any alien who enters the United States across the Canadian border at any other point than those designated shall be deemed to have entered the country unlawfully, does not exceed the scope of Immigration Act Feb. 20, 1907, c. 1134, § 36, 34 Stat. 908 (U. S. Comp. St. Supp. 1907, p. 409), declaring that all aliens who enter the United States except at the seaports thereof, or at such place or places as the Secretary of Commerce and Labor from time to time designates, shall be adjudged unlawfully in the United States, etc., and is valid, though no penalty is prescribed for violation thereof.

3. SAME—STATUTES—CONSTITUTIONALITY.

Immigration Act Feb. 20, 1907, c. 1134, §§ 1–44, 34 Stat. 898–911 (U. S. Comp. St. Supp. 1907, pp. 386–418), requiring deportation of aliens unlawfully within the United States, is constitutional.

4. CONSTITUTIONAL LAW — DEPORTATION PROCEEDINGS — "DUE PROCESS OF LAW."

The summary proceeding for the deportation of aliens recently within the United States, who have not acquired a status entitling them to remain, prescribed by Immigration Act Feb. 20, 1907, c. 1134, §§ 1–44, 34 Stat. 898–911 (U. S. Comp. St. Supp. 1907, pp. 386–418), constitutes due

process of law; such unnaturalized aliens not being entitled to the rights of citizens.

[Ed. Note.—For other definitions, see Words and Phrases, vol. 3, pp. 2227, 2256; vol. 8, p. 7644.]

5. ALIENS—DEPORTATION—FORM OF PROCEEDING.

Where, in proceedings for the deportation of a Japanese alien not entitled to enter the United States, the facts developed at the hearing, at which the alien was represented by counsel, from the alien's own testimony, showed that he was unlawfully within the United States and was subject to deportation, it was no objection to an order of deportation that he was charged with "having entered the United States without inspection," instead of "being unlawfully within the United States."

## Habeas Corpus.

The petitioner, a Japanese, shows that he is detained in custody by J. H. Barbour, inspector in charge of the immigration service at Portland, Or., by virtue of a certain telegram from the Secretary of the Department of Commerce and Labor, and a letter from the Commissioner General of the Bureau of Immigration and Naturalization of the United States; the detention being for the purpose of deporting petitioner to the Empire of Japan. Upon an order to show cause why a writ of habeas corpus should not issue as prayed, the inspector in charge, excepting to the petition for insufficiency, was permitted, by leave of court, to return and show orally why he detains petitioner in custody. From the showing, it is made to appear that on February 3, 1908, the inspector received from the Acting Secretary of Commerce and Labor a telegram, as follows: "Arrest Nobusaburo Hamaguchi, and bring before yourself for hearing; forwarding record of the proceedings to the Department. Entered the United States without inspection. Expenses execution, conveyance Portland, and detention authorized." A hearing was had on the following day, which is exhibited by the inspector's report to the Acting Secretary, as follows: "In re Nobusaburo Hamaguchi, native of Japan, aged 18 years, male, arrested on warrant of the Secretary of the Department of Commerce and Labor for having entered the United States without inspection. Examination conducted by Inspector in Charge J. H. Barbour. Counsel Walter H. Evans, appearing for alien."

Then, after setting out the testimony as given by petitioner before the inspector, the report concludes: "I transmit herewith record of hearing before me in the case of Nobusaburo Hamaguchi, arrested upon the Department's telegraphic warrant, dated the 3d instant, for entering the United States without inspection. It will be noted that in his sworn testimony the alien confesses to having entered the United States without inspection, crossing the international boundary near Blaine, Washington, during the night of October 5, 1907. In view of said admission, I would respectfully recommend that Nobusaburo Hamaguchi be deported to Japan."

Based upon this report, the Acting Secretary of Commerce and Labor transmitted, on February 9, 1908, to the inspector in charge, the following letter and directions: "Sir: The Department is in receipt of your letter of the 7th instant, No. 1349-1, with accompanying papers relating to the case of Nobusaburo Hamaguchi, charged with having entered the United States without inspection. As a result of the evidence presented it satisfactorily appears that the said alien is in this country in violation of law, and warrant of deportation has issued to the inspector in charge at Seattle, Washington, authorizing the return of the said person to Japan, at the expense of the immigrant fund. * * * You are instructed to detail an officer or employé to take charge of Nobusaburo Hamaguchi and convey him to Seattle, Washington, for deportation." The inspector further returns that the petitioner is being held for deportation in pursuance of such directions from his superior officer.

From the testimony of the petitioner, it appears that he came from Vancouver, B. C., into the United States by way of Blaine, Wash., on October 5, 1907; that he was alone, and came in on foot; that he crossed the boundary at Blaine, in the nighttime, and was not inspected; that he had a passport to Vancouver, but not to the United States; that he obtained the pass-

port to the Hawaiian Islands, then "transferred to Vancouver"; and that he left the passport in a boarding house in Vancouver. It is conceded that the occupation of the petitioner is that of laborer.

Veazie & Veazie, for petitioner.

W. C. Bristol, U. S. Atty., for Inspector Barbour.

WOLVERTON, District Judge. The principal insistence of counsel for petitioner against deportation is: That "petitioner is held and sentenced on the charge of entering the United States without inspection"; that "the law contains no provisions against entering the United States at a border point without inspection"; and that "it (the law) contains no provision against entering contrary to the rules of the Department. It prescribes no penalty for infraction of a rule of the Department."

Counsel are, I think, proceeding upon a mistaken premise, in that they base their defense upon the assumption that the petitioner is being held solely because he entered the United States without inspection. On the contrary, he is being held for deportation by reason of his being in the United States unlawfully. But of this later.

It is essential that reference be made to some provisions of the law, and to certain rules and regulations of the Department of Commerce and Labor adopted with a view to making the law effective. By section 1 of the immigration act of Congress of February 20, 1907 (chapter 1134, 34 Stat. 898 [U. S. Comp. St. Supp. 1907, p. 389]), a tax of $4 is imposed upon every alien entering the United States, and adequate provisions are made for its collection. It is further provided, however, as follows:

"That whenever the President shall be satisfied that passports issued by any foreign government to its citizens to go to any country other than the United States or to any insular possession of the United States or to the Canal Zone are being used for the purpose of enabling the holders to come to the continental territory of the United States to the detriment of labor conditions therein, the President may refuse to permit such citizens of the country issuing such passports to enter the continental territory of the United States from such other country or from such insular possessions or from the Canal Zone."

By sections 12, 13, 14, and 16 provision is made requiring manifests, a listing, examination by health officers, and due inspection at the port of arrival, of all aliens entering the United States by water transportation. Section 20 provides:

"That any alien who shall enter the United States in violation of law * * * shall, upon the warrant of the Secretary of Commerce and Labor, be taken into custody and deported to the country whence he came.

"Sec. 21. That in case the Secretary of Commerce and Labor shall be satisfied that an alien has been found in the United States in violation of this act, * * * he shall cause such alien * * * to be taken into custody and returned to the country whence he came, as provided by section twenty of this act.

"Sec. 22. That the Commissioner-General of Immigration * * * shall establish such rules and regulations * * * and shall issue from time to time such instructions, not inconsistent with law, as he shall deem best calculated for carrying out the provisions of this act; * * * all under the direction or with the approval of the Secretary of Commerce and Labor."

"Sec. 32. That the Commissioner-General of Immigration, under the direction or with the approval of the Secretary of Commerce and Labor, shall prescribe rules for the entry and inspection of aliens along the borders of Canada and Mexico, so as not to unnecessarily delay, impede, or annoy passengers in ordinary travel between the United States and said countries, and shall have power to enter into contracts with transportation lines for the said purpose."

"Sec. 35. That the deportation of aliens arrested within the United States after entry and found to be illegally therein, provided for in this act, shall be to the trans-Atlantic or trans-Pacific ports from which said aliens embarked for the United States; or, if such embarkation was for foreign contiguous territory, to the foreign port at which said aliens embarked for such territory.

"Sec. 36. That all aliens who shall enter the United States except at the seaports thereof, or at such place or places as the Secretary of Commerce and Labor may from time to time designate, shall be adjudged to have entered the country unlawfully and shall be deported as provided by sections twenty and twenty-one of this act: Provided, that nothing contained in this section shall affect the power conferred by section thirty-two of this act upon the Commissioner-General of Immigration to prescribe rules for the entry and inspection of aliens along the borders of Canada and Mexico."

By executive order issued March 14, 1907, in pursuance of the authority extended to the President, it is directed that Japanese and Korean laborers, skilled and unskilled, who have received passports to go to Mexico, Canada, or Hawaii, and come therefrom, shall be refused permission to enter the continental territory of the United States; and the Secretary of Commerce and Labor is authorized to take such measures, and to make and enforce such rules and regulations, as shall be found necessary to carry the order into effect. Immigration regulations were adopted July 1, 1907. Rule 1 relates to the collection of the head tax, and provides, among other things, that:

"The head tax payable on account of aliens entering the United States from foreign contiguous territory shall be levied and collected * * * at Canadian border ports according to the terms of an agreement between the Commissioner-General of Immigration and certain transportation companies, embodied in rules 24 and 25 hereof."

Rule 24 provides that:

"In accordance with section 36, the following are named as Canadian border ports of entry for aliens; and any alien who enters the United States across such border at any other point shall be deemed to have entered the country unlawfully, and shall be arrested and deported under sections 20, 21, and 35 of said act, in the manner provided by rule 34"—among which ports is designated Blaine, Wash.

And rule 25 that:

"In view of the agreement between the various steamship and railroad companies in the Dominion of Canada and the Commissioner-General of Immigration of the United States of America, inspection and entry of aliens into the United States from foreign countries, through Canadian territory, under the immigration act, will be accomplished in accordance with the following provisions: (a) All aliens arriving in Canada, destined to the United States, shall be inspected at any one of the following ports: [Naming Vancouver, B. C., among others.] And the holders of certificates, duly signed by the United States Commissioner of Immigration for Canada, shall be entitled to admittance to the United States, at any one of the places of entry along the border thereof named in rule 24, without further examination by the United States immigration officers as to their right to enter, upon their identification and their surrender of said certificates to such officials."

By subdivision "f" all aliens of a class, etc., are required to apply at a border port within one year after their arrival in Canada, provided, however:

"That aliens destined in good faith to Canada, and who shall have settled at some point in the Dominion of Canada, who shall apply as above [that is, at a border port] for admission to the United States within one year after arrival in Canada, shall be examined by the boards of special inquiry located at any one of the following points: [Blaine being designated among others.] That the decisions of the said boards of special inquiry shall have the same force and effect as decisions rendered by boards of special inquiry at seaports of the United States."

Sections 20 and 21 of the immigration act clearly authorize deportation of any alien who shall enter or be found in the United States in violation of law or of said act. The act, it will be seen, itself specifically provides for inspection at water ports of entry; but, as it relates to border ports, it authorizes the Commissioner-General of Immigration to prescribe rules for both entry and inspection, and also to enter into contracts with transportation lines for such purpose. In pursuance of this authority, rules 24 and 25 were adopted, by the former of which Blaine, Wash., is designated as a border port of entry from Canada. By the latter, if an alien arrives in Canada whose destination is the United States, inspection is required to be had at certain ports in Canada, and, if the applicant is entitled to admission into the United States, he receives a certificate from the United States Commissioner of Immigration for Canada, which he is required to present at the border port, and upon doing so his lawful entry may be effected without further identification or examination. But if the alien was destined to Canada, and applies at a border port for admission to the United States, he is required to submit to inspection by a board of special inquiry located at one of certain designated ports, among which Blaine, Wash., is specified. So that such an alien entering by way of Blaine, Wash., would very naturally apply at that particular port for inspection.

The applicant either came to Canada destined to the United States, or he came destined to Canada. If destined to the United States, he should have applied for inspection at one of the ports of entry designated in subdivision "a" of rule 25, and secured the certificate of the United States Commissioner of Immigration for Canada, entitling him to admission to the United States; or, if to Canada, he should have submitted himself for inspection at a border port, presumably at Blaine, Wash. But he did neither. He came in, passing Blaine in the nighttime, without seeing any of the inspecting officers. The mere statement of the case renders it clear that he entered the United States in violation of law, and the evidence, from his own mouth, shows that he was subsequently found in the United States in violation of the immigration act. But it is candidly conceded that petitioner came into the United States in violation of law, and that he is here unlawfully. Notwithstanding, he insists that the government shall get him out lawfully. This is his right, and the government would be unfaithful to the correct and regular exercise of its civic authority were it to proceed otherwise. The position, however,

is not one, it must be admitted, which appeals strongly for a liberal construction of statutory enactment, that he may be permitted to remain. Nevertheless, I assume, as in all legislation that is not penal in character, that the ordinary rules of construction should be applied, that the true intendment of Congress may be ascertained, and its will carried into effect.

Being within the United States unlawfully or illegally, section 35 requires that he shall be deported to the trans-Atlantic or trans-Pacific port from which he embarked for the United States, or, if such embarkation was for a foreign contiguous territory, then to the foreign port at which he embarked for such territory. This section fully covers the exigency of the present controversy; petitioner being found within the United States illegally. Nor do I think a different result would follow, if it be said, which it may be, as above suggested, that the petitioner entered the territory of the United States unlawfully, and is therefore subject to deportation as is prescribed by section 36. For such an entry, that section requires that he be deported as provided by sections 20 and 21, which latter sections prescribe that he shall be deported to the country whence he came. To my mind, section 35 was intended to be explanatory of the designation or expression "country whence he came," and must be read in pari materia with sections 20, 21, and 36. If the petitioner had presented himself to the inspection officers at Blaine, being without a certificate signed by a United States Commissioner of Immigration for Canada, he would have been required to submit himself for examination by a board of special inquiry located at that place, and if that board had found that he was not entitled to enter, he would, of course, have been refused admission. But, having gained entry into the United States without an observance of the immigration laws and of the rules and regulations adopted in pursuance thereof, he must be dealt with as one unlawfully coming within the territory, and unlawfully found therein, and abide the consequences to follow pursuant to law. So that it makes no difference whether the petitioner embarked for the United States or for Canada, having entered the United States from the latter country without subjecting himself to an inspection.

I have proceeded thus far as though the rules were valid and operative for the purposes for which they were intended. And why are they not? The law specifically authorizes their adoption to cover the very exigencies that are present here. "The Commissioner-General of Immigration * * * shall prescribe rules for the entry and inspection of aliens along the borders of Canada and Mexico." Such is the explicit provision of section 32, in addition to the general authority conferred by section 22 for establishing rules and regulations for carrying out the provisions of the act, and the rules provide for inspection at such border ports, so that there can be no excess of authority here. The rules prescribe no penalty, nor do they advance beyond the law in their regulation. True, by rule 24, it is provided that any alien who enters the United States across such border at any other point than those designated shall be deemed to have entered the country unlawfully; but this is no more than is provided by

section 36, and does not go beyond the purpose of that section. That the law does not impose a penalty against transportation lines for bringing in aliens across territorial borders, or require of them that they shall return the alien at their own expense, does not militate against the authority of the Commissioner-General of Immigration to prescribe rules for entry and inspection, as conferred by section 32. It is the law itself that prescribes that an entry in disregard of the requirement of the rule shall constitute an unlawful entry, which condition establishes the status of the alien as such, and subjects him to deportation, not because he is amenable criminally for any offense committed against the government, but because he has no right to remain within the continental territory of the government.

As to whether the immigration acts requiring deportation of aliens unlawfully within the United States are constitutional, and as to what is due process of law as applied to the right of a hearing in that relation by such persons, are questions fully determined by the Japanese Immigrant Case, 189 U. S. 86, 23 Sup. Ct. 611, 47 L. Ed. 721, and prior adjudications. In that case Mr. Justice Harlan, remarking on the constitutionality of prior immigration legislation, but of a like character as the present, says:

"That Congress may exclude aliens of a particular race from the United States, prescribe the terms and conditions upon which certain classes of aliens may come to this country, establish regulations for sending out of the country such aliens as come here in violation of law, and commit the enforcement of such provisions, conditions, and regulations exclusively to executive officers, without judicial intervention, are principles firmly established by the decisions of this court."

Further on he continues:

"It is not within the province of the judiciary to order that foreigners who have never been naturalized, nor acquired any domicile or residence within the United States, nor even been admitted into the country pursuant to law, shall be permitted to enter, in opposition to the constitutional and lawful measures of the legislative and executive branches of the national government. As to such persons, the decisions of executive or administrative officers, acting within powers expressly conferred by Congress, are due process of law."

And then he uses language especially applicable to the case at bar:

"Taking all its enactments together, it is clear that Congress did not intend that the mere admission of an alien, or his mere entering the country, should place him at all times thereafter entirely beyond the control or authority of the executive officers of the government. On the contrary, if the Secretary of the Treasury became satisfied that the immigrant had been allowed to land contrary to the prohibition of that law, then he could at any time within a year after the landing cause the immigrant to be taken into custody and deported. The immigrant must be taken to have entered subject to the condition that he might be sent out of the country by order of the proper executive officer if within a year he was found to have been wrongfully admitted into or had illegally entered the United States."

In the present state of the law, the Secretary of Commerce and Labor has been substituted in authority for the Secretary of the Treasury. The summary proceeding for deportation of aliens recently within the country, who have not acquired a status entitling them to remain, has become firmly established as lawful and constitutional.

United States v. Sing Tuck, 194 U. S. 161, 24 Sup. Ct. 621, 48 L. Ed. 917; United States v. Ju Toy, 198 U. S. 253, 25 Sup. Ct. 644, 49 L. Ed. 1040; Chin Yow v. United States, 208 U. S. 8, 28 Sup. Ct. 201, 52 L. Ed. ——, recently decided by the same court.

This brings us to the question of the regularity of the present proceeding. The report of the inspector in charge to the Department of Commerce and Labor is that the petitioner was brought before him "for having entered the United States without inspection." After a full hearing, the fairness of which is unquestioned, the inspector recommended to the Department that the petitioner be deported to Japan. To this recommendation came a response as follows:

"As a result of the evidence presented it satisfactorily appears that the said alien is in this country in violation of law."

The specific objection to the proceeding is that petitioner was tried on a charge of entering the United States without inspection, and not for being unlawfully within the United States. However, if he entered by evasion of a border port, and thereby escaped inspection, he was unlawfully within the United States, for which deportation would follow under the immigration act. Having not been inspected, the proceeding was at least equivalent to an inspection by the inspector in charge, and, finding that the petitioner was unlawfully in the country, it became his duty to make report accordingly. Thereupon it was incumbent upon the Commissioner of Immigration to take the proper steps for petitioner's deportation. That petitioner was not specifically charged with being unlawfully within the country does not militate against the authority of the Commissioner-General to deport him, finding that he was in fact unlawfully herein. Nor has the petitioner been deprived of a hearing with reference to that charge. Neither was he misled to his injury by the actual charge preferred. The petitioner was represented by counsel, and all the facts were developed at the hearing, and came from witness' own mouth, warranting his deportation. The summary proceeding provided by law does not require that technical regard for forms that is deemed essential in criminal proceedings, and, having had a full hearing, whereat it was developed that he is unlawfully within the country, and the finding and recommendation of the inspector in charge being against him, I am not disposed to require that the procedure be gone through with again for the sake of stricter observance of form; the law having been observed in substance. It would be better in all such cases that the party be charged with being unlawfully within the country, specifying in what particulars the unlawfulness consists; but where a full and fair hearing has been had involving that charge, I think it would be extremely technical to hold that deportation should not follow until a further hearing be given.

The petitioner, being a Japanese laborer, comes clearly within the class of citizens whom the executive order declares shall be refused permission to enter the United States. He embarked upon a passport to Hawaii, and transferred to Canada, and thereafter made his way into the United States. Having embarked for contiguous territory upon a passport to such contiguous territory, with a view, pre-

sumptively, of entering the United States, because he did do so, and having entered clandestinely and without submitting himself to the proper authorities for inspection, he must be held to be unlawfully within the United States, and therefore his deportation was properly directed. Lavin v. Le Fevre, 125 Fed. 693, 60 C. C. A. 425.

The petition for a writ of habeas corpus will be denied.